UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

SEAN KUCHENMEISTER,                      :

                        Plaintiff,       :        16 Civ. 7975 (HBP)

    -against-                            :        OPINION
                                                  AND ORDER[1]
                                         :
NANCY A BERRYHILL,                       :
Commissioner of Social Security[2]
                                         :
                        Defendant.       :
--------------------------------X

        PITMAN, United States Magistrate Judge:


I.  Introduction


        Plaintiff Sean A. Kuchenmeister brings this action

pursuant to section 205(g) of the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security (the "Commis-

---

    [1]With the consent of the parties, this matter has been
referred to me for all purposes pursuant to 18 U.S.C. § 636(c).
Nevertheless, this decision was inadvertently issued as a Report
and Recommendation on January 17, 2018 (Docket Item ("D.I.") 22).
My Report and Recommendation of January 17, 2018 is hereby
vacated and the decision is reissued as this Opinion and Order.
There is no substantive difference between the January 17 Report
and Recommendation and this Opinion and Order.

    [2]Nancy A. Berryhill, who became the acting Commissioner of
Social Security on January 23, 2017, is substituted as the
defendant in this action in place of Carolyn W. Colvin.  See
Fed.R.Civ.P. 25(d).

sioner") denying his application for supplemental secure income ("SSI").[3] Plaintiff and the Commissioner have both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (D.I.) 17, 19). For the reasons set forth below, the Commissioner's motion (D.I. 19) is granted and that the plaintiff's motion (D.I. 17) is denied.

## II. Facts[4]

### A. Procedural Background

On September 18, 2013, plaintiff filed an application for SSI and DIB, alleging a disability onset date of January 1, 2005 (Tr. 161-71). In plaintiff's "Disability Report," dated September 18, 2013 and filed in connection with plaintiff's application for SSI and DIB, he alleged that he was disabled due to, agoraphobia,[5] schizoaffective disorder,[6] depression, anxiety

---

[3]In addition to SSI, plaintiff applied for Disability Insurance Benefits ("DIB"). That application was also denied. Plaintiff does not challenge the Commissioner's decision denying his application for DIB (Complaint dated Oct. 12, 2016 (D.I. 1)("Complaint").

[4]I recite only those facts relevant to my resolution of the pending motions. The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing for Administrative Record, dated April 10, 2017 (D.I. 12) ("Tr.") more fully sets out plaintiff's medical history.

[5]"Agoraphobia is defined as '[a] mental disorder
(continued...)

and panic attacks (Tr. 185). At that time, plaintiff took Clonidine, Paxil, Xanax and Zyprexa (Tr. 187).

On November 18, 2013, the SSA denied plaintiff's applications, finding that he was not disabled (Tr. 96-99). Plaintiff timely requested and, on January 30, 2014, was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 100-01). ALJ Dennis Katz conducted a hearing on January 13, 2015, at which plaintiff, represented by counsel, testified on his own behalf (Tr. 51-77). Plaintiff withdrew his application for DIB prior to the hearing, making the SSA's November 18, 2013 decision the final decision of the Commissioner with respect to plaintiff's entitlement to DIB (Tr. 1, 53-54). ALJ Katz reviewed

---

[5](...continued)
characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or avoided[. Agoraphobia is] often associated with panic attacks.'" Simonds v. Astrue, 1:10-CV-317, 2012 WL 912779 at *1 n.1 (D.Vt. Jan. 11, 2012), citing, Stedman's Medical Dictionary at 40 (28th ed. 2006).

[6]Schizoaffective disorder "is a mental disorder in which a person experiences a combination of schizophrenia symptoms, such as hallucinations or delusions, and mood disorder symptoms, such as depression or mania." Schizoaffective Disorder, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504 (last visited Dec. 22, 2017). There are two types of schizoaffective disorder: (1) bipolar type and (2) depressive type. Schizoaffective disorder, bipolar type is associated with manic episodes and, sometimes, major depression, while Schizoaffective disorder, depressive type, includes only major depressive episodes. Schizoaffective Disorder, supra.

plaintiff's claim for SSI de novo and, in a decision dated March 13, 2015, determined that plaintiff was not disabled and, thus, was not entitled to SSI (Tr. 21-37). ALJ Katz's decision became the Commissioner's final decision on August 9, 2016, when the Appeals Council denied plaintiff's request for review (Tr. 1-7). Plaintiff commenced this action on October 12, 2016, seeking judicial review of the Commissioner's decision (Complaint).

B. Plaintiff's
Social Background

Plaintiff was born on August 18, 1984 and was 29 years old at the time he filed his application for SSI (Tr. 181). Plaintiff was born in Pleasant Valley, New York, but spent his childhood and teenage years in Miami, Florida, where he lived with his mother, father and step-brother in what he described as a "rough" area (Tr. 263). Plaintiff began abusing prescription painkillers at the age of 13 and marijuana at 14 (Tr. 266). When he was 18 years old, plaintiff started using heroin (Tr. 266). Plaintiff sought inpatient treatment for his substance abuse twice in 2008 and once in 2012 (Tr. 262).

At the time plaintiff filed his application for SSI, he lived with his father in Dutchess County, New York (Tr. 55). Between 2001 and 2005, plaintiff was a yard worker for a lumber

company; in that job, he lifted and carried sheet rock, cement and lumber, and used machines tools and equipment (Tr. 187). He stopped working at the lumber yard in 2005 for reasons that are not entirely clear from the record (Tr. 322). Plaintiff obtained his GED in 2009 and was unemployed between 2005 and 2013 (Tr. 322). Plaintiff made several attempts to secure employment in 2013, including brief stints as a landscaper, a construction worker and a mover (Tr. 55-56). However, he could not maintain any of these jobs for more than a few days due to his allegedly disabling impairments (Tr. 55, 63-64).

Plaintiff has a daughter who was about five years old at the time he applied for SSI, and who lived with her mother and, later, her mother's boyfriend (Tr. 256, 317). Plaintiff was permitted to visit his daughter whenever he wished, but had difficulty coordinating such visits with her mother throughout 2013 (Tr. 256, 317). Plaintiff reported having a "strong" support system, consisting of his father, mother, uncle and a few close friends with whom he regularly spoke by telephone (Tr. 199, 263). However, plaintiff did not like being around others or leaving his house (Tr. 57, 61, 66-69, 197). He spent the major- ity of his time at home and seldom went out in public due to his anxiety and agoraphobia and his feeling that others were watching and judging him (Tr. 61, 197). For example, plaintiff rarely

went grocery shopping due to his aversion to being around others
(Tr. 61, 97). When he did leave his home, plaintiff relied on
others to get him from place to place because he did not have a
driver's license (Tr. 57).

In plaintiff's "Function Report," dated October 13,
2013, submitted in connection with his application for SSI and
DIB, he stated that he had no problem taking care of most of his
personal needs, including dressing, bathing and shaving, and was
able to perform household chores, including cleaning, laundry and
repairs (Tr. 194-96). He also cooked for himself daily, although
he mostly made simple dishes (Tr. 196).

C.  Plaintiff's
Medical Background

1.  Medical Records that Pre-Date
the Relevant Time Period

a.  Hudson Valley Mental Health

Plaintiff attended the Hudson Valley Mental Health
("HVMH") clinic in Millbrook, New York, where he received therapy
and medication to treat his anxiety, agoraphobia, depression and
panic attacks (Tr. 314). Plaintiff's initial assessment with
Social Worker ("SW") Lauren Scelia was held on November 13, 2012,
during which he complained of, among other things, panic attacks

6

with agoraphobia (Tr. 314). Plaintiff denied suicidal or homi-
cidal ideation (Tr. 314). He also told SW Scelia that he had
recently used marijuana and that he had a history of substance
abuse that included abusing prescription painkillers (Tr. 314).

On November 27, 2012, SW Scelia noted that plaintiff
appeared more nervous and agitated and was less talkative than he
had been at his prior appointment (Tr. 314). SW Scelia also
observed that plaintiff had difficulty maintaining normal eye
contact (Tr. 314). Although plaintiff complained of social
anxiety that prevented him from continuing his education and
maintaining employment, he also reported having "strong" support
from his family (Tr. 314). Plaintiff reported the continued use
of marijuana, but stated that he was open to addressing his
substance abuse and anxiety through therapy (Tr. 314).

HVMH generated a "Mental Health Treatment Plan,"[7] dated January 7, 2013 in which plaintiff was diagnosed as suffering from a panic disorder with agoraphobia and a depressive disorder, not otherwise specified ("NOS"); plaintiff was assigned a global assessment functioning score ("GAF")[8] of 45 (Tr. 310-11).

Plaintiff cancelled or failed to attend individual therapy sessions with SW Scelia on December 10, 2012, January 3, January 28 and February 11, 2013 (Tr. 314). On February 11,

---

[7]HVMH's Mental Health Treatment Plans are periodic assessments of its clients' mental health status (see Tr. 306-16). In substance, the report is comprised of three separate sections: (1) a mental health assessment; (2) a diagnostic review and (3) a treatment plan (see 306-16). The portion containing an assessment of a client's mental health is created using the treatment notes and observations contemporaneously collected during a client's individual therapy or medication management session (see Tr. 306-08). The creation of a Mental Health Treatment Plan on a particular date does not appear to imply that the client to whom the report pertains had an appointment at HVMH that day.

[8]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008), quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 2000)). A score of 41-50 indicates serious symptoms, a score of 51-60 indicates moderate symptoms and a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally functioning "pretty well." See Global Assessment of Functioning, New York State Office of Mental Health, available at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited July 7, 2017).

2013, HVMH terminated plaintiff as a client pursuant to clinic policy (Tr. 314).

Plaintiff reestablished treatment with HVMH on June 25, 2013 (Tr. 315). Plaintiff reported to SW Scelia that he still suffered from mild depression and anxiety, including the same symptoms that he had detailed during his November 13, 2012 initial assessment (Tr. 315). He again denied suicidal or homicidal ideation, but also expressed little desire to continue living (Tr. 262, 315). SW Scelia performed a "psychosocial" assessment of plaintiff, during which plaintiff told her that he had difficulty socializing with others due to anxiety and that he felt suspicious and paranoid of others (Tr. 262-74). Plaintiff reported that an unidentified primary care physician had pre-scribed medication for him for several years, and that he had seen a private counselor, who he had last visited approximately one year prior to that date (Tr. 262). He had also seen a therapist and a psychiatrist at Spectrum Behavioral Health ("SBH") as recently as February 2013, but stopped that treatment because he could not pay his medical bills (Tr. 262). Plaintiff reported using marijuana daily and that he had a history of using heroin and abusing prescription painkillers (Tr. 266). Plaintiff

explained that his agoraphobia had led him to self-medicate with illicit substances, but reported that he had not used intravenous heroin in over two years (Tr. 267).

SW Scelia observed that plaintiff's appearance was clean, his attitude was cooperative, open and pleasant, his attire was appropriate, his eye contact was good and his mood was anxious, depressed and dysphoric (Tr. 271). Although plaintiff's affect was stable and appropriate to content and situation, it was flat and constricted (Tr. 272). Plaintiff's speech was clear and spontaneous, but also slow and monotonous (Tr. 272). Plaintiff had normal cognition with full orientation and good concentration and attention (Tr. 272). His insight and judgment were fair and his intellectual functioning was average (Tr. 273-74). SW Scelia found that plaintiff's long term memory was poor, but that his immediate and recent memory were good (Tr. 273). Plaintiff's thought processes were goal directed, but his thought content was depressive, fearful and problem focused (Tr. 273). He reported prior suicidal ideation, but stated that the thought of never seeing his daughter again drove him away from contemplating taking his own life (Tr. 273).

SW Scelia opined that plaintiff had some difficulty "establishing and maintaining a support system" due to his poor social skills and social isolation or withdrawal (Tr. 263).

10

However, SW Scelia also noted that plaintiff had an adequate social support network consisting of his father, mother, other family members and a few close friends (Tr. 263). Furthermore, she concluded that plaintiff did not have difficulty relating to others (Tr. 263). SW Scelia also opined that plaintiff did not have any limitation that affected, or that he required any assistance with, his functioning (Tr. 264). SW Scelia diagnosed plaintiff with (1) a panic disorder with agoraphobia and (2) a depressive disorder, NOS (Tr. 275). She recommended continued individual therapy sessions and medication to control and treat his symptoms, to increase "positive coping skills" and to identify the adverse impacts of marijuana on his symptoms (Tr. 268).

After failing to show up for a July 11, 2013 appointment, plaintiff returned to HVMH on July 16, 2013 concerned that his primary care physician could no longer prescribe him his medication (Tr. 316). SW Scelia encouraged him to go to the Emergency Room if he ran out of medication prior to his appointments with his psychiatrists (Tr. 316). Plaintiff also reported that he had been using marijuana to treat his anxiety, but that he would like to stop once his medications were adjusted (Tr. 316). He denied using other illicit substances (Tr. 316). Plaintiff complained of continued anxiety, depression and difficulty upon leaving his home, and became tearful when discussing

11

his daughter, whom he was unable to see as frequently as he wished due to his inability to commute on his own and his fear of leaving his home (Tr. 316). SW Scelia encouraged plaintiff to utilize both the time that he spent with his daughter, and other positive coping skills, to decrease his anxiety (Tr. 316).

Plaintiff saw Dr. Aurora Carino, a psychiatrist at HVMH, on July 26, 2013; during the visit, she renewed plaintiff's prescriptions for Klonapin and Clonidine, which his primary care physician had previously prescribed (Tr. 317).

Plaintiff cancelled an appointment with SW Scelia on August 1, 2013 (Tr. 317). On August 20, 2013, plaintiff saw Dr. Alan Nussbaum, a psychiatrist at HVMH, for a medication management session (Tr. 257). Among other things, plaintiff reported that he avoided others, spent most of his time at home and had relapsed on prescription painkillers in January or February 2013 (Tr. 257). Dr. Nussbaum found that plaintiff's mood was depressed, his affect was constricted, his insight and judgment were limited and his intelligence was below average (Tr. 258). However, he also found that plaintiff's long and short term memory were intact (Tr. 258). Although plaintiff told Dr. Nussbaum that he suffered from confusion and that his thought processes were disorganized "at least 50% of the time," Dr. Nussbaum observed that plaintiff's thought processes were orga-

nized during the examination (Tr. 258).  However, Dr. Nussbaum

also concluded that plaintiff had paranoid delusions that "people

want[ed] to hurt him" (Tr. 258).  Dr. Nussbaum renewed plain-

tiff's prescription of Klonapin and Clonidine, and also pre-

scribed Paxil for plaintiff's depression, anxiety and agoraphobia,

bia, and Zyprexa for his paranoid delusions and disorganized

thoughts (Tr. 258).  Dr. Nussbaum recommended that plaintiff

continue to see a therapist and that he join a support group for

his substance abuse (Tr. 258).  Dr. Nussbaum diagnosed plaintiff

with:  (1) schizoaffective disorder, bipolar type; (2) panic

disorder with agoraphobia; (3) generalized anxiety disorder and

(4) polysubstance dependence, in remission, and polysubstance

abuse (Tr. 258).  Dr. Nussbaum also assigned plaintiff a GAF of

45 (Tr. 260).

On August 26, 2013, plaintiff reported that he contin-

ued to suffer from anxiety and paranoia (Tr. 317).  SW Scelia

noted that plaintiff was calm and pleasant during the session,

and that he denied suicidal or homicidal ideation (Tr. 317).  He

also told SW Scelia that he had been spending time with his

daughter and that he continued to have the support of his family

(Tr. 317).

Plaintiff saw SW Scelia again on September 13, 2013

with complaints that his medications were ineffective and that he

continued to feel overwhelmed in public, experience disorganized thoughts and had difficulty leaving his home (Tr. 318). He reported utilizing anxiety coping strategies, such as listening to music and breathing techniques (Tr. 318). SW Scelia noted that plaintiff appeared calm and pleasant during the therapy session, but observed that he was tearful and sad at times (Tr. 318).

Dr. Nussbaum met with plaintiff on September 17, 2013, and decreased plaintiff's dose of Zyprexa from 20 mg to 10 mg, noting that it had been effective in lessening his paranoia (Tr. 318). However, because plaintiff had developed a tolerance to Klonapin, Dr. Nussbaum replaced his prescription with Xanax to treat his anxiety (Tr. 318).

b. Spectrum Behavioral Health

Plaintiff sought treatment at Spectrum Behavioral Health ("SBH") in Poughkeepsie, New York on January 31, 2013 (Tr. 254-56).[9] He complained of anxiety, agoraphobia and panic attacks and identified his inability to see his daughter regularly

[9]An unidentified SBH staff member took handwritten notes, which are largely illegible, during plaintiff's intake session (Tr. 254). Accordingly, my description of plaintiff's January 31, 2013 appointment at SBH is limited to the facts that could be deciphered from this portion of the record (Tr. 254).

as one of the primary causes of these problems (Tr. 256). An unspecified SBH staff member observed that plaintiff was cooperative, his grooming and motor activity were normal and his thought processes were coherent (Tr. 255). Plaintiff was oriented to time, person and place, and his memory was fully intact (Tr. 255). However, the examining SBH staff member found that plaintiff's mood and affect were depressed and anxious, and that his concentration, insight and impulse control were limited (Tr. 255). Plaintiff reported taking Zoloft, Ambien and Clonazolam (Tr. 249). The SBH staff member diagnosed plaintiff with, among other things, a panic disorder, anxiety, social phobia and alcohol and opiate dependence, in remission, and assigned plaintiff a GAF of 57 (Tr. 256). Plaintiff's Clonazolam was replaced with Klonapin (Tr. 256).

On February 14, 2013, plaintiff saw SW Fran Berman with complaints of depression, anxiety and agoraphobia (Tr. 246). Plaintiff also reported that he had difficulty concentrating and suffered from frequent panic attacks (Tr. 249). SW Berman noted that plaintiff had an irritable, depressed and angry mood, a flat affect and poor insight (Tr. 251). In addition, she found that the results of plaintiff's reality testing[10] indicated a level of

---

[10]Reality testing assesses a patient's ability to
(continued...)

impairment (Tr. 251). However, SW Berman also found that plaintiff's attention, concentration and thought content were within normal limits (Tr. 251). She diagnosed plaintiff with a panic disorder with agoraphobia and assigned him a GAF in the range of 65 to 70 (Tr. 251).

## 2. Medical Records During the Relevant Time Period

### a. Hudson Valley Mental Health

SW Scelia held a therapy session with plaintiff on October 15, 2013, during which plaintiff reported increased anxiety and isolation (Tr. 319). SW Scelia noted that plaintiff had made attempts to confront his anxiety as he had been instructed; he had gone grocery shopping, but reported that he had shopped at a quick pace and wound up forgetting items due to his anxiety (Tr. 319).

On October 23, 2013, HVMH generated another Mental Health Treatment Plan, which noted that plaintiff had attended three out of four scheduled individual therapy sessions and one

---

[10] (...continued)
distinguish between their "internal thoughts, feelings and ideas" and events that are based in reality. What is Reality Testing and Why is it Important, Counselling Directory, available at http://www.counselling-directory.org.uk/counsellor-articles/what-is-reality-testing-why-is-it-important (last visited Dec. 27, 2017).

out of two medication management sessions (Tr. 280). Plaintiff's diagnoses remained the same as those made by Dr. Nussbaum on August 20, 2013 (Tr. 285; see Tr. 260). The report also indicated that plaintiff was attending peer support groups, including Alcoholics Anonymous ("AA"), once per week, as recommended by SW Scelia (Tr. 281). Plaintiff returned to see SW Scelia on October 29, 2013, complaining of depression, anxiety and isolation (Tr. 320). SW Scelia noted that plaintiff appeared sad during the session (Tr. 320). However, plaintiff reported having occasional "good days" when he could leave the house and do errands (Tr. 320). Furthermore, plaintiff stated that he continued to have the support of his family (Tr. 320).

Plaintiff attended a medication management session with Dr. Nussbaum on November 12, 2013, during which Dr. Nussbaum concluded that Xanax and Zyprexa had been effective in decreasing plaintiff's paranoia and anxiety, respectively (Tr. 320). Plaintiff failed to attend an individual therapy session scheduled for later that same day with SW Scelia (Tr. 321).

The medical record indicates that plaintiff did not visit HVMH again for nearly nine months, until July 7, 2014 when he saw Mental Health Counselor Carol Phillhower, who found that plaintiff's mental health status was unchanged (Tr. 352-56). Plaintiff reported taking his medication as prescribed by Dr.

17

Nussbaum, but also admitted to using marijuana and drinking coffee (Tr. 352). MHC Phillhower explained that plaintiff's use of marijuana and caffeine amplified his symptoms and lessened the effectiveness of medications (Tr. 352-56). She advised him to stop using both (Tr. 352-56).

On September 30, 2014, HVMH created a Mental Health Treatment Plan, which noted that plaintiff had complained of worsening anxiety and agoraphobia and that he was very fearful of leaving his home (Tr. 370). Plaintiff had attended four out of his six scheduled individual therapy sessions and all three of his scheduled medication management sessions (Tr. 370). The report noted that both plaintiff and an unidentified physician had questioned plaintiff's medication regimen at his last appointment because the unidentified physician felt that Xanax was not controlling his anxiety (Tr. 370). In addition, plaintiff's Paxil dose was increased to 40 mg in the morning and 20 mg at night (Tr. 370). Although plaintiff was assigned a GAF of 45, his prognosis was found to be fair to good, so long as he followed his medication regimen and his therapists' recommendations (Tr. 376). The report indicates that plaintiff continued to use marijuana occasionally, but that he was attending group support meetings once per week (Tr. 371).

Another Mental Health Treatment Plan was prepared on December 23, 2014; it showed that plaintiff had attended only two of his six scheduled individual therapy sessions, but had attended all four of his scheduled medication management sessions (Tr. 361). The report also states that plaintiff's lack of progress was due to his inability to attend individual therapy sessions and his noncompliance with his therapists' recommendations (Tr. 361). Although plaintiff had generally been compliant with his medication regimen, plaintiff had misplaced his Xanax and, thus, had missed several doses and was feeling more anxious (Tr. 361). However, plaintiff did not present with overt elation or psychosis, nor did he have any suicidal or homicidal ideations (Tr. 361). Plaintiff reported that he continued to use marijuana and was considering attending an outpatient substance abuse program (Tr. 362). Plaintiff was diagnosed with: (1) schizoaffective disorder; (2) panic disorder with agoraphobia; (3) generalized anxiety disorder and (4) polysubstance dependence abuse and dependence in remission (Tr. 366). He was also assigned a GAF of 45 (Tr. 366).

b. Taina Ortiz, Psy.D.
   Consultative Psychologist

Dr. Taina Ortiz, a psychologist with Industrial Medicine Associates in Poughkeepsie, New York, performed a psychiatric evaluation of plaintiff on November 4, 2013, in connection with his application for SSI (Tr. 322-26). Plaintiff told Dr. Ortiz that he suffered from depression, anxiety, paranoid ideations and daily panic attacks that included symptoms of palpitations, sweating, overheating and stomach problems (Tr. 323). He told Dr. Ortiz that he took Xanax, Zyprexa and Paxil to treat these conditions (Tr. 322). Dr. Ortiz concluded that plaintiff did not suffer from any manic or cognitive symptoms (Tr. 323).

Plaintiff reported that he was able to dress, bathe and groom himself, and that he prepared his own meals, performed household chores and did his own laundry, but was unable to shop for himself due to his anxiety and panic attacks (Tr. 324). Plaintiff also reported that he spent the majority of his time at home (Tr. 325). Although plaintiff did not have a driver's license, he told Dr. Ortiz that he was able to take public transportation (Tr. 324). Furthermore, plaintiff stated that, despite his anxiety, which prevented him from socializing with others, he had a good relationship with his family (Tr. 325). Plaintiff also reported having a history of marijuana and opiate

20

abuse (Tr. 323). Dr. Ortiz noted that plaintiff indicated that he discontinued his drug use around August 2013 and that he denied symptoms of dependence or withdrawal (Tr. 323).

Dr. Ortiz observed that plaintiff appeared to be his stated age, was dressed and groomed appropriately and had appropriate posture and eye contact (Tr. 323). She further found that plaintiff's speech was normal, his thought processes were coherent and goal directed and that he did not present with hallucinations, delusions or paranoia in the evaluation setting (Tr. 324). In addition, his mood was neutral, he was oriented to time, person and place, his intellectual functioning was average, his judgment and insight were fair and his memory was fully intact (Tr. 324).

Dr. Ortiz provided a "medical source statement," in which she opined that she had found no evidence of any limitation in plaintiff's ability to "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule[] and learn new tasks" (Tr. 325). Dr. Ortiz also found that, due to his anxiety and substance abuse issues, plaintiff had "mild limitations in his ability to perform complex tasks with others, make appropriate decisions, relate adequately with others and appropriately deal with stress."(Tr. 325). She further noted

21

that plaintiff's limitations were not significant enough to interfere with his ability to function on a daily basis (Tr. 325). She diagnosed plaintiff with: (1) panic disorder with agoraphobia and (2) opiate dependence and abuse (Tr. 325). She concluded his prognosis was fair, and recommended that he continue psychiatric and psychological treatment (Tr. 325). Dr. Ortiz also recommended that plaintiff receive assistance in managing any benefits that he might be awarded, due to his history of substance abuse (Tr. 325).

c.  Hillary Tzetzo, M.D.,
Consultative Psychiatrist

On November 15, 2013, Dr. Hillary Tzetzo, a consultative psychiatrist who examined and assessed plaintiff in connection with his application for SSI, rendered her findings and opinions regarding his medically determinable impairments and residual functional capacity ("RFC") (Tr. 83-87). Dr. Tzetzo found that plaintiff had two medically determinable impairments -- an anxiety disorder and a substance addiction disorder -- but that plaintiff's conditions did not meet or equal the requirements of a listing impairment (Tr. 83-84). In particular, Dr. Tzetzo considered the requirements of listing 12.06 (anxiety and obsessive-compulsive disorders) and 12.09 (substance abuse

22

disorder) (Tr. 83-84). See 20 C.F.R. Pt. 404, Subpt. P, App. 1.
In reaching her determination, Dr. Tzetzo acknowledged that
plaintiff had some limitations in his daily functioning; plain-
tiff reported he was unable to shop for himself or take public
transportation due to anxiety and frequent panic attacks (Tr.
84). However, Dr. Tzetzo also concluded that plaintiff was able
to dress, bathe, groom cook and clean without any assistance, and
that he had no difficulty getting along with his family (Tr. 84).
Furthermore, she noted that plaintiff's social skills during the
examination were within normal limits, his motor behavior and eye
contact were appropriate, his thought processes were clear, his
affect was normal, his insight and judgment were fair, his mood
was neutral and his attention, concentration and memory were
intact (Tr. 84). Dr. Tzetzo concluded that plaintiff's anxiety
and panic attacks were being treated with psychotropic medica-
tion, including Paxil, Xanax and Zyprexa (Tr. 84). Dr. Tzetzo
noted that plaintiff had a history of marijuana and opiate use
from 2002 through August 2013, when plaintiff stated that he had
last used any illicit substances or alcohol (Tr. 84).

Dr. Tzetzo opined that despite the limitations on
plaintiff's ability to interact and relate with co-workers and
the public, he could adequately sustain "brief and superficial"

contact with others and adapt to normal supervision in the
customary work setting (Tr. 84).

Dr. Tzetzo then assessed plaintiff's RFC (Tr. 85-87).
She found that plaintiff was not significantly limited in his
ability to: (1) recall locations and work-like procedures; (2)
understand, remember and carry out very short and simple instruc-
tions; (3) make work-related decisions that did not require
judgment; (4) ask simple questions or seek help; (5) get along
with co-workers or peers and (6) be aware of normal work place
hazards and take appropriate precautions (Tr. 85-86). Dr. Tzetzo
identified moderate limitations on plaintiff's ability to: (1)
understand, remember and carry out detailed instructions; (2)
maintain attention and concentrate for extended periods; (3)
perform activities within a schedule, maintain regular attendance
and be punctual; (4) sustain an ordinary routine with special
supervision; (5) work in coordination with or in proximity to
others; (6) complete a normal workday and workweek without
interruptions from psychologically based symptoms and perform at
a consistent pace without an unreasonable number and length of
rest periods; (7) interact appropriately with the public; (8)
accept instructions and respond appropriately to criticism from
supervisors; (9) maintain socially appropriate behavior and
adhere to basic standards of neatness and cleanliness; (10)

24

respond to changes in the workplace; (11) travel in unfamiliar places or use public transportation and (12) set realistic goals or make plans independently of others (Tr. 85-86).

D.   Proceedings Before the ALJ

   1.   Plaintiff's Testimony

An attorney represented plaintiff at the January 13, 2015 hearing before ALJ Katz, at which plaintiff testified (Tr. 53-77). Plaintiff testified that he suffered from, among other things, agoraphobia, panic attacks, paranoia and disorganized thoughts (Tr. 55-65). Plaintiff testified that he spent the majority of his time at home with his father due to anxiety, panic attacks and his fear of being in public (Tr. 55-57). Although he testified that on certain days he could leave the house and go grocery shopping, he stated that he rarely did so due to his strong aversion to being around others (Tr. 58).

Plaintiff testified that, at that time, he was seeing a "counselor" and a therapist to manage his mental health issues (Tr. 60). Furthermore, plaintiff saw a case manager ("CM"), Anthony Anderson, through an organization called Mental Health for America ("MHA") of Dutchess County (Tr. 60, 62). CM Anderson, who plaintiff testified he had been seeing for a "couple of

years," visited plaintiff at his home twice a month (Tr. 62).
Plaintiff testified that he had previously abused prescription
opiates and marijuana, and that CM Anderson was also his sub-
stance abuse counselor (Tr. 68). He testified that he had not
used any illicit substances for more than one year (Tr. 60, 64).
Plaintiff also testified that he took medication to treat his
anxiety and agoraphobia, but did not list any by name (Tr. 63).

Plaintiff testified that he worked in a lumber yard
between 2001 and 2005, but that after leaving that job for
unspecified reasons he had not been employed until September 2013
(Tr. 55-56). Since September 2013, plaintiff had made at least
three attempts to rejoin the workforce, but had been unable to
maintain any job for more than "a week or two" (Tr. 55). Specif-
ically, plaintiff testified that he had worked for a landscaping
company mowing lawns, but could not continue because he felt as
though people watched him from their windows while he was working
(Tr. 56, 64). Plaintiff left work early on his third day of
employment due to a panic attack, and was fired following his
fourth day after suffering from another panic attack and again
leaving work early (Tr. 64). Plaintiff also worked for his
uncle's construction company, but did not testify how long he
held that job, what position he held or why he could not continue
(Tr. 56). Plaintiff testified that most recently he had worked

for a moving company, but was let go after one week (Tr. 64). He testified that he had missed at least two days of work due to panic attacks (Tr. 56). Plaintiff stated that he believed he would be unable to maintain employment because his panic attacks would result in excessive and unacceptable absences (Tr. 59).

2. <u>CM Anthony Anderson's Testimony</u>

CM Anderson also testified at the hearing (Tr. 66-73). He explained that his organization helped plaintiff "function in the community" by assisting him secure employment, obtain medical treatment and therapy and become more social (Tr. 66). CM Anderson had been plaintiff's CM and substance abuse counselor for more than two years (Tr. 66). CM Anderson testified that, although plaintiff had visited his office once or twice, he typically visited to plaintiff at home for counseling sessions because plaintiff did not like leaving his house (Tr. 70). CM Anderson twice stated that he did not know whether plaintiff had difficulty interacting with others, as he had never observed plaintiff interact with anyone besides his father and uncle and that plaintiff seemed comfortable with both (Tr. 68). However, CM Anderson also testified that plaintiff spent much of his time at home and did not like going outside (Tr. 68). Specifically,

plaintiff had rebuffed all of CM Anderson's efforts to engage him in social events organized by MHA (Tr. 68-69).

CM Anderson stated that he had tried to help plaintiff secure employment, but plaintiff would cancel job interviews or skip work due to his panic attacks (Tr. 66-67). CM Anderson testified that plaintiff wanted to work, but just "couldn't do it" (Tr. 67).

CM Anderson also monitored plaintiff's sobriety during their sessions (Tr. 71). CM Anderson was aware of plaintiff's previous use of marijuana and opioids; in particular, CM Anderson testified that plaintiff had previously self-medicated to treat his panic attacks when he had run out of psychotropic medication (Tr. 68, 71-72). CM Anderson did not believe plaintiff's marijuana usage caused his difficulties functioning and socializing, nor did he believe that plaintiff used marijuana to socialize with others (Tr. 72). CM Anderson testified that plaintiff had not used marijuana in more than a year (Tr. 73).

### 3. Vocational Expert's Testimony

Vocational expert David Vanderhoot (the "VE") also testified at the hearing (Tr. 60-73). The ALJ asked the VE to consider whether an individual with plaintiff's vocational profile, who could perform work at all exertional levels, but

28

only at unskilled jobs that are simple and routine, do not require significant judgment and require only occasional interaction with the public or co-workers, could perform any occupations in the regional or national economy (Tr. 73-76). The VE testified that such an individual could perform work as defined in the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") as a routing clerk, DOT Code Number 222.687-022, of which there are 69,000 positions nationally, photo copy machine operator, DOT Code No. 207.685-014, of which there are 23,000 positions nationally, and a store's laborer, DOT Code No. 922.687-058, of which there are 129,000 positions nationally (Tr. 74). The VE also testified that a person who could attend a work site one day each week due to agoraphobia and anxiety would not be able to sustain employment (Tr. 75).

III.  Analysis

    A.  Applicable Legal
        Principles

        1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based on an erroneous legal standard. 42 U.S.C. §

405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>);[11] <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "'affirm an administrative action on grounds different from those considered by the agency.'" <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015) (<u>per curiam</u>), <u>quoting</u> <u>Burgess v. Astrue</u>, <u>supra</u>, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. <u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d Cir. 2003), <u>citing</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only

---

[11]<u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 409, was an appeal from the denial of DIB. However, the standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. <u>Barnhart v. Thomas</u>, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the former are equally applicable to cases involving the latter.

one conclusion, there is no need to require agency reconsideration." <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>, <u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>), <u>quoting</u> <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 417 (internal quotation marks omitted).

2. Determination
   of Disability

A claimant is entitled to SSI if he can establish an "inability to engage in substantial gainful activity by reason of

any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and inability to work must last twelve months).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), § 1382c(a)(3)(B). Whether such work is actually available in the area in which the claimant resides is immaterial 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background age and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.

1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

 In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 416.920(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii). If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4)(iii). To be found disabled based on a listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant listing. 20 C.F.R. § 416.925(c)(3); Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007). If the claimant meets a listing, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(iii).

 If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's RFC and whether the claimant can still perform his past relevant

work given his RFC. 20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 416.920(a)(5)(v). If he cannot, he will be found disabled. 20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite his limitations." 20 C.F.R. § 416.945(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c) and (d) of 20 [C.F.R. §] 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at *1 (July 2, 1996). The results of this assessment determine the claimant's ability to perform the exertional demands[12] of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy. 20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further

---

[12]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs [sitting, standing, walking, lifting carrying, pushing and pulling]." 20 C.F.R. § 416.969a(b).

by nonexertional factors that restrict claimant's ability to work.[13]

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work

---

[13]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 416.969a(c).

experience. Based on these factors, the Grid[s] indicate[]
whether the claimant can engage in any other substantial gainful
work which exists in the national economy." Gray v. Chater,
supra, 903 F. Supp. at 208; see Butts v. Barnhart, supra, 388
F.3d at 383.

Exclusive reliance on the Grids is not appropriate
where nonexertional limitations "significantly diminish [a
claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603
(2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.
"Significantly diminish" means "the additional loss of work
capacity beyond a negligible one or, in other words, one that so
narrows a claimant's possible range of work as to deprive him of
a meaningful employment opportunity." Bapp v. Bowen, supra, 802
F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421;
Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010). When the ALJ
finds that the nonexertional limitations significantly diminish a
claimant's ability to work, then the Commissioner must introduce
the testimony of a vocational expert or other similar evidence in
order to prove "that jobs exist in the economy which the claimant
can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at
383-84 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the

regulations make clear that the individual's particular limitations must be considered.").  An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983) (footnote omitted); accord Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

### 3. Credibility

In determining a claimant's RFC, the ALJ is required to consider the claimant's reports of pain and other limitations, 20

C.F.R. § 416.929, but is not required to accept the claimant's subjective complaints without question. McLaughlin v. Secretary of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983), citing Richardson v. Perales, supra, 402 U.S. at 399; see Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Secretary, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984). The ALJ has discretion to weigh the credibility of the claimant's testimony in light of the medical findings and other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective complaints.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [her] impairment(s),

> [her] restrictions, [her] daily activities, [her]
> efforts to work, or any other relevant statements [she]
> make[s] to medical sources during the course of exami-
> nation or treatment, or to [the agency] during inter-
> views, on applications, in letters, and in testimony in
> [its] administrative proceedings." 20 C.F.R. §
> 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);
> S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (emphasis in original);

see Snyder v. Colvin, supra, 667 F. App'x at 320, citing SSR 16-

3P, 2016 WL 1020935 (Mar. 16, 2016)[14]; 20 C.F.R. § 416.1529(a).

The ALJ must explain the decision to reject a claimant's testi-

mony "'with sufficient specificity to enable the [reviewing]

Court to decide whether there are legitimate reasons for the

ALJ's disbelief' and whether [the ALJ's] decision is supported by

substantial evidence." Calzada v. Astrue, 753 F. Supp. 2d 250,

280 (S.D.N.Y. 2010) (Sullivan, D.J.) (first alteration in origi-

nal) (adopting report and recommendation), quoting Fox v. Astrue,

No. 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12 (N.D.N.Y. Mar.

26, 2008); see Lugo v. Apfel, 20 F. Supp. 2d 662, 664 (S.D.N.Y.

1998) (Rakoff, D.J.). The ALJ's determination of credibility is

entitled to deference. See Snell v. Apfel, 177 F.3d 128, 135 (2d

Cir. 1999) ("After all, the ALJ is in a better position to decide

issues of credibility."); Gernavage v. Shalala, 882 F. Supp.

---

[14]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
See SSR 16-3P, supra, 2016 WL 1237954.

1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.) ("Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor.").

B. The ALJ's Decision

ALJ Katz applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 21-37).

At step one of the sequential analysis, ALJ Katz determined that plaintiff had not engaged in any substantial gainful activity since September 18, 2013, the date on which he filed his application for SSI (Tr. 26).

At step two, ALJ Katz found that plaintiff had the following severe medically determinable impairments: panic disorder with agoraphobia and substance abuse disorder in partial remission (Tr. 26, citing 20 C.F.R. § 416.920(c)).

At step three, ALJ Katz found that plaintiff's impairments did not meet or equal the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of disability (Tr. 26-28). Specifically, ALJ Katz analyzed whether plaintiff's mental impairments met listings 12.06 (anxiety and obsessive-compulsive disorders) and 12.09 (substance abuse disorder) (Tr. 26-28). ALJ Katz acknowledged that plaintiff had moderate difficulties with concentration,

persistence or pace and concluded that plaintiff had mild re-
strictions in his ability to perform activities of daily living
and in social functioning (Tr. 27). ALJ Katz also found that
plaintiff had never experienced an episode of decompensation for
an extended duration (Tr. 27). ALJ Katz concluded that, in the
absence of marked limitations or episodes of decompensation of an
extended duration, paragraph B criteria of listings 12.06 and
12.09 did not apply, meaning that plaintiff could only meet the
requirements of those listings if paragraph C criteria were
satisfied (Tr. 27). Accordingly, ALJ Katz also considered
whether paragraph C criteria were satisfied and found that the
evidence failed to establish that plaintiff met these criteria
because, despite plaintiff's reported history of social anxiety,
he did not require any supportive living arrangement and he was
able to interact with others and perform normal activities of
daily living when motivated (Tr. 27-28).

      ALJ Katz then determined that plaintiff had the RFC to
perform a full range of work at all exertional levels, except
that he is limited to the nonexertional limitations of "perform-
ing unskilled work which is simple, routine and repetitive; does
not require significant judgment calls to be made[] and requires
only occasional contact with the public" (Tr. 28).

As part of his analysis of the severity of plaintiff's conditions and in order to reach the RFC determination, ALJ Katz examined the opinions of the treating and consultative sources and assessed the weight to be given to each opinion based on the objective medical record (Tr. 31-32).

ALJ Katz gave some weight to the clinical examinations of plaintiff's treating sources at HVMH and SBH (Tr. 32). Specifically, ALJ Katz found that SW Scelia and MHC Phillhower's treatment notes "contain[ed] few clinical findings and denote mostly subjective reports from [plaintiff]" of allegedly disabling anxiety, panic attacks and agoraphobia (Tr. 30). However, ALJ Katz acknowledged that the notes also contained some clinical findings; for example, in July 2013, SW Scelia noted that plaintiff appeared calm and did not present with evidence of psychosis at his therapy session (Tr. 29). ALJ Katz also found that HVMH's Mental Health Treatment Plans "d[id] not contain psychiatric assessments but contain[ed] a number of 'updates' comprised of self reports of continued anxiety and isolative behavior" (Tr. 30). However, ALJ Katz acknowledged that, like the treatment notes in the record, the reports reflected plaintiff's inability to keep appointments and his noncompliance with his treatment recommendations (Tr. 30).

ALJ Katz gave "some weight" to Dr. Tzetzo's opinion that plaintiff had (1) a mild restriction in activities of daily living; (2) a moderate restriction in maintaining concentration, persistence and pace; (3) a moderate restriction in social functioning and (4) no episodes of decompensation of extended duration (Tr. 32). ALJ Katz noted that Dr. Tetzo's findings were consistent with the treatment notes, which also identified plaintiff's difficulties in concentration and social interaction, but found that much of his functioning in these areas remained normal (Tr. 32). Furthermore, ALJ Katz noted that Dr. Tzetzo's familiarity with the Commissioner's regulations also afforded her opinions some credibility (Tr. 32).

ALJ Katz also accorded "great weight" to consultative psychologist Dr. Ortiz's opinion that plaintiff's mild difficulties in appropriately dealing with stress and his history of substance abuse were not sufficiently significant to interfere with plaintiff's ability to function on a daily basis (Tr. 30-31). Specifically, ALJ Katz found that Dr. Ortiz's assessments provided substantial evidence that plaintiff could engage in basic, unskilled work-related activities that were not too complex (Tr. 30). ALJ Katz also found it significant that Dr. Ortiz's detailed opinions were consistent with the objective medical record, including HVMH and SBH's treatment notes and

clinical findings (Tr. 30). In addition, ALJ Katz noted that Dr. Ortiz was an expert in the field of psychology, and had actually examined plaintiff (Tr. 31).

Finally, ALJ Katz concluded that Mr. Anderson's testimony had to be viewed as somewhat biased because he was plaintiff's case manager who had known plaintiff for more than two years and helped plaintiff attempt to secure employment (Tr. 32). ALJ Katz noted that Mr. Anderson is not a medical source and, thus, while his testimony was useful in assessing the nature and severity of plaintiff's impairments, it could not be used to determine plaintiff's RFC (Tr. 32).

ALJ Katz also considered plaintiff's testimony and found that while plaintiff's medically determinable impairments could have caused his alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persistence and limiting effects were not entirely credible (Tr. 31). ALJ Katz found it significant the objective medical record reflected that plaintiff's symptoms appeared to be controlled with counseling and medication, but that plaintiff did not to adhere to his medication regimen and routinely missed counseling (Tr. 30-31). ALJ Katz also noted that the objective record, including assessments, reports and treatment notes from plaintiff's treating and consultative sources, indicated that

44

plaintiff was capable of performing substantially all unskilled jobs in the national economy, because his ability to understand instructions, respond to supervision and deal with routine changes in the work setting remained intact (Tr. 31, citing SSR 85-15, 1985 WL 56857 at *4 (Jan. 1, 1985)). Furthermore, ALJ Katz concluded that, based on the medical evidence and plaintiff's own testimony and evidence that plaintiff's polysubstance dependence was in remission in August 2013, plaintiff's substance abuse issues were not significant enough to interfere with his ability to function on a daily basis (Tr. 29). Finally, at several points in his decision, ALJ Katz noted plaintiff's failure to attend therapy sessions and his noncompliance with his therapists' recommendations and medication regimen, including plaintiff's continued use of marijuana despite his therapist's instructions to the contrary (Tr. 28-32).

At step four, ALJ Katz found that plaintiff was able to perform his past relevant work as a "store laborer", which was an unskilled position that required medium-level work (Tr. 32, citing 20 C.F.R. § 416.965). Moreover, it required only occasional contact with the public and other co-workers, and did not require plaintiff to make significant decisions requiring judgment (Tr. 32).

ALJ Katz noted that plaintiff was between 18 and 49 years of age and, thus, was a "younger individual" with a GED and an ability to communicate in English (Tr. 33, citing 20 C.F.R. §§ 416.963, 416.964).

At step five, ALJ Katz found that, based on the Grids and the VE's testimony, jobs existed in significant numbers in the national economy that plaintiff could perform, given his age, education, work experience and RFC (Tr. 33, citing 20 C.F.R. §§ 416.969 and 416.969(a)).

C.    Analysis of the
       ALJ's Decision

Plaintiff argues that ALJ Katz committed legal error and that his decision was not supported by substantial evidence (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated July 12, 2017 (D.I. 18)("Pl. Mem.") at 6). Specifically, plaintiff appears to argue that ALJ Katz committed legal error by improperly evaluating plaintiff and CM Anderson's credibility and failing to consider whether there was good cause for plaintiff's noncompliance with his treatment program (Pl. Mem at 6-14, 16-19). Plaintiff also contends that ALJ Katz selectively relied on evidence chosen from the medical record in making his RFC determination (Pl. Mem. at 14-16). The

Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, dated Sep. 15, 2017 (D.I. 20)("Def. Mem."))

### 1. Credibility

#### a. Plaintiff's Credibility

It is "within the discretion of the Commissioner to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995)(Leisure, D.J.); accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Evans v. Astrue, 783 F. Supp. 2d 698, 710-11 (S.D.N.Y. 2011)(Gorenstein, M.J.); see Aponte v. Sec'y of Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Dep't of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). "The ALJ is not required to accept the claimant's subjective complaints; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Barnwell v. Colvin, 13 Civ. 3683 (HBP), 2014 WL 4678259 at *12 (S.D.N.Y. Sep. 19,

2014)(Pitman, M.J.), citing Gernavage v. Shalala, supra, 882 F. Supp. at 1419.

As explained above, the regulations provide a two step framework which the Commissioner must use to assess the credibility of a claimant's allegations of disabling pain or other limitations. See Genier v. Astrue, supra 606 F.3d at 49; see also Snyder v. Colvin, supra, 667 F. App'x at 320, citing SSR 16-3P, 2016 WL 1020935 (Mar. 16, 2016); 20 C.F.R. § 416.929(a). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [his] symptoms." 20 C.F.R. § 416.929(b). "That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability." Genier v. Astrue, supra, 606 F.3d at 49, citing 20 C.F.R. § 404.1529(a); see 20 C.F.R. § 416.929(a). If the ALJ determines that the claimant does suffer from a medically determinable impairment, the ALJ must next consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." 20 C.F.R. § 416.929(a); see Genier v. Astrue, supra, 606 F.3d at 50 ("[T]he ALJ [has an] obligation to consider 'all of the relevant medical and other evidence' [in determining claimant's credibil-

ity]," citing 20 C.F.R. § 404.1545(a)(3)); see 20 C.F.R.

416.945(a)(3).

"Objective medical evidence" is defined by the regula-

tions to mean "medical signs and laboratory findings." 20 C.F.R.

§ 416.929(a). However, the ALJ must also consider "other evi-

dence," including statements and reports by the claimant showing

how [his] impairment(s) and any related symptoms affect [his]

ability to work." 20 C.F.R. § 416.929(a). The ALJ must specifi-

cally consider particular factors, including: (1) plaintiff's

"daily activities," (2) "location, duration, frequency and

intensity" of plaintiff's symptoms, (3) "[f]actors that precipi-

tate and aggravate" plaintiff's symptoms, (4) "type, dosage,

effectiveness and side effects of any medication" plaintiff takes

for his symptoms, (5) other treatment plaintiff receives for

relief from his symptoms, (6) "[a]ny measures other than treat-

ment" plaintiff uses for relief from his symptoms and (7) "[a]ny

other factors" regarding plaintiff's limitations resulting from

his symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii); SSR 96-7p,

supra, 1996 WL 374816 at *4 (July 2, 1996). "When rejecting

subjective complaints, an ALJ must do so 'explicitly and with

sufficient specificity to enable the Court to decide whether

there are legitimate reasons for the ALJ's disbelief.'" Rockwood

v. Astrue, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009), quoting

Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)(Leisure, D.J.). "[T]he court must uphold the ALJ's decision to discount a claimant's subjective complaints" if that decision is supported by substantial evidence. Aponte v. Sec'y of Dep't of Health & Human Servs., 728 F.2d at 591.

ALJ Katz accurately described plaintiff's testimony concerning his symptoms, including the fact that plaintiff suffered from anxiety, multiple daily panic attacks and agoraphobia that precluded him from holding a job for more than a few days (Tr. 28-32). However, the ALJ did not entirely credit this testimony, finding that "the medical evidence d[id] not corroborate these assertions" (Tr. 29).

In considering plaintiff's daily activities, ALJ Katz referenced Dr. Ortiz's November 4, 2013 clinical assessment notes, which indicate that plaintiff reported he could dress, bathe, and groom himself, cook, wash laundry, clean, take public transportation and manage money, but relied on his father to do his shopping (Tr. 30). See 20 C.F.R. § 416.929(c)(3)(i). In addition to the evidence ALJ Katz explicitly discussed in his decision, other substantial evidence supports his conclusion. For example, Dr. Tzetzo, like Dr. Ortiz, found that plaintiff could take care of most of his personal needs. Indeed, plaintiff also stated in his Disability Report, dated September 18, 2013,

that he could dress, bathe, cook, and do household chores himself (Tr. 196). Furthermore, plaintiff made contradictory statements to Drs. Ortiz and Tzetzo concerning his ability to take public transportation (Tr. 84, 234). See Reynolds v. Colvin, 570 F. App'x 45, 47 (2d Cir. 2014)("A lack of supporting evidence . . . where the claimant bears the burden of proof, particularly coupled with other inconsistent evidence, can constitute substantial evidence supporting a denial of benefits."). Although plaintiff stated that he was unable to leave his house, plaintiff was also able to attend group support meetings, such as AA, weekly, and visit with his daughter (Tr. 262, 371).

ALJ Katz also considered the frequency and intensity of plaintiff's symptoms (Tr. 28-32). See 20 C.F.R. § 416.929 (c)(3)(ii). ALJ Katz acknowledged that plaintiff complained to his treating sources at HVMH and SBH, as well as consultative psychologists Drs. Ortiz and Tzetzo, that he suffered from "anxiety with multiple daily panic attacks," "disorganized thought processes," "isolative behavior" and paranoia, among other things (Tr. 29-30). However, ALJ Katz also found it significant that clinical findings regarding plaintiff's mental health were mostly within normal limits (Tr. 29-30). For example, the ALJ referenced SW Scelia's treatment notes from July 2013, which recorded plaintiff's complaints of increasing anxi-

ety, frequent panic attacks and agoraphobia, but which also indicated that plaintiff appeared relatively calm with an appropriate affect and exhibited no evidence of psychosis or distress at the examination (Tr. 29). In addition to the evidence referenced by ALJ Katz in his decision, the record contains substantial evidence that tends to undercut plaintiff's statements concerning the severity and limiting effects of his symptoms. For example, in plaintiff's Disability Report, dated September 18, 2013, he stated that he spoke on the telephone with family and/or friends "every couple of days," and that he did not have any problem getting along with others, including neighbors, co-workers and bosses (Tr. 199). Furthermore, plaintiff's weekly attendance at group support meetings, including AA, contradicted plaintiff's claims that his agoraphobia and anxiety severely restricted his activities (Tr. 272, 371).

Plaintiff contends that ALJ Katz erred by essentially requiring "objective medical evidence" to credit plaintiff's testimony, and ignoring plaintiff's subjective reports to his physicians concerning the severity of his symptoms (Pl. Mem. at 10). Plaintiff argues that ALJ Katz should have found plaintiff credible based upon his subjective statements about the disabling nature of his symptoms, which were recorded and accepted by his treating and consultative sources, citing <u>Green-Younger v.</u>

Barnhart, 335 F.3d 99, 107 (2d Cir. 2003). See also Donato v. Sec. of Dep't of Health & Human Servs., supra, 721 F. 2d at 418-19 ("Subjective pain may serve as the basis for establishing disability, even if . . . unaccompanied by positive clinical findings of other 'objective' medical evidence." (emphasis in original)(citation omitted)).

As an initial matter, plaintiff's argument mischaracterizes ALJ Katz's evaluation of the record. As explained above, ALJ Katz considered not only the objective observations of plaintiff's treating and consultative sources, but also plaintiff's statements to his therapists and psychiatrists at HVMH and SBH concerning the severity and persistence of his anxiety, panic attacks and agoraphobia (Tr. 28-32). For example, ALJ Katz acknowledged that plaintiff reported to Dr. Ortiz on November 4, 2013, that he suffered from multiple daily panic attacks, had difficulty concentrating and that he suffered from paranoid delusions (Tr. 30). However, ALJ Katz found it significant that these reports conflicted with Dr. Ortiz's clinical observations that plaintiff's "psychiatric problems and substance abuse issues . . . were not significant enough to interfere with his ability to function on a daily basis" (Tr. 30). See Williams v. Barnhart, 314 F. Supp. 2d 269, 274 (S.D.N.Y. 2004)(Marrero, D.J.) ("Courts frequently consider and rely upon patient reports

of ailments when those reports were accepted by the patient's treating physician and [were] not contradicted.")

Moreover, plaintiff's reliance on Green-Younger v. Barnhart, supra, 335 F.3d at 107 is misplaced. That case involved a plaintiff who suffered from fibromyalgia,[15] a physical impairment which the Second Circuit described as "elud[ing] measurement," noting that, despite a fibrositis patient's complaints of "unremitting pain," clinical examinations and measurements "will usually yield normal results." 335 F.3d at 107-08; Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 45 (2d Cir. 1991). "Following Green-Younger, a number of District Courts [in this Circuit] have overturned denials of disability claims based on fibromyalgia where the ALJ's determination turned on the lack of 'objective' evidence in the record to support the claimant's subjective complaints of pain." Lim v. Colvin, 243 F. Supp. 3d 307, 316-17 (emphasis added), citing Crysler v. Astrue, 563 F. Supp. 2d 418, 440-41 (N.D.N.Y. 2008) (remanding denial of benefits where ALJ determined claimant's fibromyalgia was not disabling because it was not supported by objective medical findings). Plaintiff does not argue that the same considerations

_____

[15]Fibromyalgia is "pain and stiffness in the muscles and joint that either is diffuse or has multiple trigger points." Dorland's at 703.

54

which apply to fibromyalgia should apply to plaintiff's medically determinable impairments of agoraphobia, panic attacks or anxiety, nor does he cite any case law that suggests the Green-Younger standard is applicable to the conditions he claims.

ALJ Katz also considered plaintiff's medication; he noted that plaintiff's psychological impairments were "apparently controllable" with medication (Tr. 30). See 20 C.F.R. §§ 416.929(c)(3)(iv)-(v). In particular, ALJ Katz referenced SBH's treatment notes which showed that plaintiff's GAF increased from 57 to 65-70 one month after plaintiff was prescribed Klonapin (Tr. 29, 256).[16] The record contains other examples that show plaintiff responded well to psychotropic medication. For example, on September 17, 2013, Dr. Nussbaum found that Zyprexa lessened plaintiff's paranoia, and on November 12, 2013, he also found that Xanax effectively treated plaintiff's anxiety (Tr. 318-19).

ALJ Katz also considered plaintiff's compliance with his treatment program (Tr. 28-32). In particular, ALJ Katz

---

[16]Admittedly, plaintiff's subsequent GAF scores taken by HVMH were much lower at 45. ALJ Katz acknowledged this discrepancy, and discounted it by finding that plaintiff's GAF scores from HVMH were inconsistent with HVMH's treatment notes, including a finding that plaintiff's prognosis was good, and noting that the GAF is "a mere snapshot of the claimant's ability to function" (Tr. 31).

referenced HVMH's Mental Health Plan, generated on December 23, 2014, which stated that plaintiff's lack of progress in treating his mental impairments was due to his failure to attend individual therapy sessions and his noncompliance with his therapists' recommendations (Tr. 30, 361). A claimant's adherence to treatment once it is prescribed is a pertinent factor in evaluating the credibility of claimant's statements concerning the intensity, persistence and limiting effects of his pain or other symptoms. See Miller v. Colvin, 13-CV-6512 (EAW), 2015 WL 628359 at *12 (W.D.N.Y. Feb. 12, 2015); SSR 96-7p, supra, 1996 WL 374186 at *7. For example, "the [claimant's] statements may be less credible if the level of frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed." SSR 96-7p, supra, 1996 WL 374186 at *7. However, "the adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain or irregular medical visits or failure to seek medical treatment." SSR 96-7p, supra, 1996 WL 374186 at *7. In order to evaluate properly a claimant's failure to comply with treatment, the ALJ may need to

"recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not . . . pursue treatment in a consistent manner." SSR 96-7p, supra, 1996 WL 374186 at *7.

The Commissioner lists six examples upon which a claimant may rely in asserting that his noncompliance was justified: (1) claimant's religion forbids prescribed treatment; (2) a medical source advised claimant that the prescribed treatment is futile; (3) the side effects of medication are intolerable; (4) claimant is unable to afford treatment and has no access to affordable medical services; (5) claimant's symptoms are not so severe that they require treatment and (6) claimant structures his daily activities so as to minimize or eliminate symptoms by avoiding any stressors that exacerbate those symptoms. SSR 96-7p, supra, 1996 WL 374186 at *7. These examples are not intended to be an exhaustive list of good reasons for claimant's non-compliance with a treatment program. SSR 96-7p, supra, 1996 WL 374186 at *7. However, "a reason alone does not provide the plaintiff a 'free pass' for non-compliance." Bockeno v. Commissioner of Soc. Sec., 5:14-CV-0365 (GTS), 2015 WL 5512348 at *7 (N.D.N.Y. Sept. 15, 2015).

Considering all of the evidence, ALJ Katz concluded that the objective evidence showed that plaintiff: (1) failed "to

make progress due to his non-compliance with his treatment recommendations" and (2) did not regularly attend scheduled therapy sessions (Tr. 30). With respect to his finding that plaintiff failed to comply with his treating sources' recommendations, ALJ Katz cited plaintiff's continued use of marijuana, despite his therapists' warnings that it interfered with his medication and amplified his symptoms of anxiety, agoraphobia and panic attacks (Tr. 32). Specifically, ALJ Katz referenced a November 2012 therapy session with SW Scelia, during which plaintiff admitted to using marijuana on a daily basis and SW Scelia explained that the drug could have a negative impact on his symptoms (Tr. 268). Evidence in the medical record not referenced in ALJ Katz's decision also supports his finding that plaintiff continued to use marijuana despite his therapists' recommendations to the contrary. For example, on July 7, 2014, plaintiff told MHC Phillhower that he had been using marijuana and drinking coffee (Tr. 352). MHC Phillhower explained that both substances could adversely impact his symptoms and diminish the effectiveness of his medications (Tr. 352). She encouraged him to stop using both (Tr. 352).

Plaintiff does not argue that his use of marijuana to self-medicate is a "good reason" for his failure to follow his prescribed treatment under SSR 96-7p; he does not even address

his marijuana use and its interference with his treatment pro-
gram. "To be sure, faulting a plaintiff with a diagnosed mental
illness for failing to pursue mental health treatment is a
'questionable practice.'" Slater v. Commissioner of Soc. Sec.,
5:14-CV-255 (GTS), 2015 WL 6157396 at *9 (N.D.N.Y. Oct. 20,
2015), citing Day v. Astrue, 07 CV 157 (RJD), 2008 WL 63285 at *5
n.7 (E.D.N.Y. Jan. 3, 2008) ("Even if plaintiff had failed to
provide an explanation for the gap in treatment records, the
Court notes our sister court's admonition criticizing 'the use of
a lack of treatment to reject mental complaints . . . because it
is questionable practice to chastise one with a mental impairment
for the exercise of poor judgment in seeking rehabilitation,"
citing Regennitter v. Commissioner of Soc. Sec. Admin., 166 F.3d
1294, 1299-1300 (9th Cir.) (internal quotations and citation
omitted)). However, ALJ Katz's decision did not do that. ALJ
Katz explicitly found that "there is no evidence that [plain-
tiff's] drug use [was] material to [his] psychiatric issues" (Tr.
32). This determination is supported by the case record, includ-
ing HVMH's treatment notes and CM Anderson's testimony, which
indicate that plaintiff used marijuana to self-medicate (Tr. 72,
267). ALJ Katz noted multiple times that plaintiff continued to
use marijuana despite explicit recommendations by his treating
sources to the contrary (Tr. 32). Therefore, ALJ Katz properly

complied with SSR 96-7p to the extent that he took plaintiff's noncompliance with treatment due to his continued use of mari-juana into consideration when analyzing his credibility by considering his noncompliance with his therapists' recommendations and the reasons for doing so. SSR 96-7, supra, 1996 WL 374186.

ALJ Katz also considered plaintiff's excessive and unexcused absences from therapy sessions in evaluating his credibility. Four times throughout his analysis ALJ Katz refer-enced HMVH treatment notes indicating plaintiff regularly failed to attend or cancelled therapy sessions as a basis for finding plaintiff not entirely credible (Tr. 29-30, 32). Plaintiff contends that ALJ Katz committed error by failing to consider that plaintiff's conditions of agoraphobia and panic attacks interfered with his treatment program, which included leaving his home to attend therapy sessions (Pl. Mem. at 19). Indeed, ALJ Katz's decision does not indicate that he considered any explana-tion plaintiff might have offered for failing to attend approxi-mately 14 therapy appointments between January 2012 and December 2014, nor does the objective record shed light upon the reasons for plaintiff's inconsistent attendance at sessions. See Schlicting v. Astrue, 11 F. Supp. 3d 190, 207 (N.D.N.Y. 2012)(holding that the ALJ erred by failing to consider plain-

tiff's reasons for failing to seek treatment for his allegedly disabling mental impairments). Thus, ALJ Katz erred in considering plaintiff's inconsistent attendance of therapy sessions in determining plaintiff's credibility without further inquiry. See Clark v. Astrue, 08 Civ. 10389 (LBS), 2010 WL 3036489 at *5 (S.D.N.Y. Aug. 4, 2010)(Sand, D.J.); see also Day v. Astrue, supra, 2008 WL 63285 at *5 n.7 (E.D.N.Y. Jan. 3 2008). Thus, ALJ Katz erred in so far as he considered plaintiff's inconsistent attendance of therapy sessions in determining plaintiff's credibility.

Nevertheless, ALJ Katz's error was harmless. ALJ Katz's overall determination to discount plaintiff's subjective complaints is supported by substantial evidence, even if plaintiff's inconsistent attendance at therapy sessions is ignored. See Schlichting v. Astrue, supra, 11 F. Supp. 2d at 207 (ALJ's consideration of the level of absences from treatment without probing claimant's justification for such absences was harmless error where the remaining portions of the ALJ's credibility assessment were supported by substantial evidence), citing Walzer v. Chater, 93 Civ. 6240 (LAK), 1995 WL 791963 at *9 (S.D.N.Y. Sept. 26, 1995)(Kaplan, D.J.)(finding that ALJ's failure to discuss a treating physician's report was harmless error where consideration of report would not have altered outcome). As

outlined above, ALJ Katz found plaintiff's testimony inconsistent with the clinical assessments and treatment notes of his treating sources, and consultative examiners, as well as plaintiff's own statements in his Disability Report. The objective record supports ALJ Katz's credibility assessment, including findings that plaintiff was able to attend weekly group support meetings and maintained a small but close support network with whom he interacted regularly, which undercut plaintiff's claims regarding the constraining nature of his mental impairments (Tr. 272, 371). Accordingly, the ALJ's error with respect to plaintiff's failure to regularly pursue treatment does not provide a basis to disturb the decision.

In conclusion, ALJ Katz adhered to the proper legal framework and exercised appropriate discretion in evaluating plaintiff's testimony. ALJ Katz rendered an independent judgment regarding the extent of plaintiff's subjective complaints based on the objective medical evidence and other evidence. See e.g. Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984).

b. CM Anthony Anderson's Credibility

Plaintiff contends that ALJ Katz's characterization of CM Anderson as "sympathetic to the plaintiff" clearly demonstrates that ALJ Katz committed legal error by failing to prop-

erly consider opinion evidence from CM Anderson (Pl. Mem. at 12, citing Tr. 31). As set forth above, on page 49, the regulations require an ALJ to consider "other evidence" which is defined by the regulations as "any other information [claimant] submits about [his] symptoms," in evaluating the intensity and persistence of a claimant's symptoms. 20 C.F.R. § 416.929(c)(2). See 20 C.F.R. § 416.913(d) ("In addition to evidence from acceptable medical sources . . . we may also use evidence from other sources to show the severity of your impairments and how it affects your ability to work . . . ."); see also Williams v. Barnhart, supra, 314 F. Supp. 2d at 274 ("[L]ay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so"), quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). The Commissioner has instructed that "non-medical sources who have had contact with the individual in their professional capacity, such as . . . social welfare agency personnel . . . are also valuable sources of evidence for assessing impairment severity and functioning." SSR 06-03p, 206 WL 2329939 (Aug. 9, 2006).[17]

---

[17]SSR 06-03p was rescinded on March 27, 2017; however, the
(continued...)

In considering opinions from "other sources," the Commissioner instructs that "it would be appropriate" for the ALJ to consider: (1) the "nature and extent" of the relationship between the claimant and the source; (2) the source's qualifications and expertise; (3) the evidentiary support in the record, or lack thereof, corroborating the source's opinion and (4) "any other factors that tend to support or refute the opinion." SSR 06-03p, supra, 2006 WL 2329939 at *5; see generally Porter v. Colvin, 14-CV-547S, 2016 WL 1084162 at *5 (Mar. 21, 2016) ("[N]ot every factor for weighing opinion evidence will apply in every case." (quotation marks and citation omitted)).

CM Anderson, plaintiff's case manager and substance abuse counselor, testified that plaintiff was "afraid to go outside," was unable to partake in social activities organized by MHA, could not maintain a job for more than two or three days because of his overwhelming anxiety and panic attacks (Tr. 66-72). ALJ Katz accurately classified CM Anderson's testimony as opinion evidence from a non-medical source and determined that CM Anderson's testimony was "valuable in assessing the nature and severity of [plaintiff's] impairments" but offered "little

---

[17](...continued)
provisions were incorporated in 20 C.F.R. § 416.927(f), which will govern consideration of opinions of non-acceptable medical sources in claims filed after March 27, 2017.

probative value in determining plaintiff's RFC." ALJ Katz
expressly considered the nature and extent of CM Anderson's
relationship with plaintiff, and concluded that, because the two
had known each other for more than two years and their relation-
ship was ongoing, CM Anderson must be viewed as a "party sympa-
thetic to [plaintiff]" (Tr. 32). See Porter v. Colvin, supra,
2016 WL 1084162 at *5 ("[T]he ALJ has full discretion to deter-
mine the appropriate weight to accord the opinion of an 'other
source' based on all the evidence before him." (quotation marks
and citation omitted)). Accordingly, ALJ Katz assessed CM
Anderson's credibility properly and provided germane reasons for
finding CM Anderson's testimony biased in favor of plaintiff.
See Porter v. Colvin, supra, 2016 WL 1084162 at *5 ("[T]he [ALJ]
should explain the weight given to opinions from these 'other
sources,' or otherwise ensure that the discussion of the evidence
allows a . . . reviewer to follow the [ALJ's] reasoning," (empha-
sis and alterations in original), citing Piatt v. Colvin, 80 F.3d
480, 493 (W.D.N.Y. 2015)).

Furthermore, CM Anderson's testimony significantly
overlapped with plaintiff's subjective complaints. Specifically,
CM Anderson and plaintiff both testified that plaintiff could not
maintain a job and disliked leaving his home or being around
others (Tr. 55-69). ALJ Katz's decision provided specific

reasons supported by substantial evidence for discrediting plaintiff's testimony regarding the severity of his symptoms and, thereby also discredited CM Anderson's consistent testimony, providing germane reasons for finding CM Anderson not entirely credible. Accordingly, ALJ Katz reached his credibility determination using the correct legal standards consistent with the regulations and case law in this district.

### 2. Failure to Consider Whether Plaintiff had Good Cause for Noncompliance with Treatment

Relying on 20 C.F.R. § 416.930, plaintiff argues that ALJ Katz failed to consider whether plaintiff had "good cause to miss appointments [and not comply with treatment recommendations] due to the nature of his psychiatric impairment" (Pl. Mem. at 17).

"The regulations require an ALJ to deny benefits to any claimant who does not follow prescribed treatment that can restore his or her ability to work, and who does not have an acceptable reason for refusal." Rockwood v. Astrue, supra, 614 F. Supp. 2d at 252; see 20 C.F.R. § 416.930. The Commissioner may only make such a determination where all of the following conditions exist

> 1.  The evidence establishes that the individual's
> impairment precludes engaging in any Substantial
> Gainful Activity . . .; and
>
> 2.  The impairment has lasted or is expected to last
> for 12 continuous months from onset of disability or is
> expected to result in death; and
>
> 3.  Treatment which is clearly expected to restore
> capacity to engage in any Substantial Gainful Activity
> (or gainful activity, as appropriate) has been
> prescribed by a treating source; and
>
> 4.  The evidence of record discloses that there has
> been refusal to follow prescribed treatment.

SSR 82-59, 1982 WL 31384 at *1 (Jan. 1, 1982); see 20 C.F.R. §

416.930.  Where an ALJ makes such a determination, the ALJ must

consider and determine whether the claimant's failure to follow

prescribed treatment was justified.  See SSR 82-59, supra, 1982

WL 31384 at *1.

ALJ Katz did not rule that plaintiff was not entitled

to benefits because he failed to follow a treatment program that

would restore his ability to work and, thus, plaintiff's reliance

on 20 C.F.R. § 416.930 is misplaced.  Rather, he evaluated

plaintiff's claim pursuant to the five-step sequential evaluation

set forth by a separate, independent regulation, and determined

that plaintiff's impairments were not so severe that he could not

perform his past relevant work (Tr. 28-32).  20 C.F.R. § 416.920.

Thus, ALJ Katz never made the finding that plaintiff attacks in

this argument.

### 3. Selective Reliance on Evidence

An ALJ may not "pick and choose evidence which favors a finding that a claimant is not disabled." Clark v. Colvin, 15 Civ. 354 (KBF), 2017 WL 1215362 at *9 (S.D.N.Y. Apr. 3, 2017)(Forrest, D.J.), quoting Rodriguez v. Astrue, 07 Civ. 534 (WHP)(MHD), 2009 WL 637154 at *25 (S.D.N.Y. Mar. 9, 2009)(Pauley, D.J); accord Meadors v. Astrue, supra, 370 F. App'x at 185 n. 2 (the ALJ "cannot simply selectively choose evidence in the record that supports his conclusions" (internal quotation marks omitted)); Kebreau v. Astrue, 11 CV 13 (RJD), 2012 WL 3597377 at *2 (E.D.N.Y. Aug. 20, 2012); Cruz v. Barnhart, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004)(Berman, D.J.). Plaintiff claims that the ALJ did this in at least three places: (1) in his description of the effects of plaintiff's medication; (2) in his description of plaintiff's reports of "disorganized thinking" and (3) in his description of plaintiff's failure to adhere to his medication regimen.

First, the ALJ's description of Dr. Nussbaum's treatment notes with respect to the effectiveness of plaintiff's medications is accurate. On September 17, 2013, Dr. Nussbaum increased plaintiff's Zyprexa from 10 mg to 20 mg, noting that it was effective in treating plaintiff's paranoid delusions (Tr.

318). On November 12, 2013, Dr. Nussbaum noted that plaintiff was "doing well" on Xanax and Zyprexa, and that both his paranoia and anxiety had decreased (Tr. 320). Plaintiff did not report any side effects from his psychotropic medication at either appointment. (Tr. 318, 320). In his decision, the ALJ stated that "Dr. Nussbaum . . . prescribed medication, which progress notes show a resulting decrease in the claimant's symptoms of paranoia and anxiety with no side effects." Accordingly, plaintiff's assertion that ALJ Katz misrepresented Dr. Nussbaum's treatment notes from November 12, 2013 are rejected.

Second, although ALJ Katz did not include in his decision every detail of plaintiff's report to Dr. Nussbaum on August 20, 2013, he captured the essential nature of plaintiff's complaint (Tr. 29). On August 20, 2013, plaintiff told Dr. Nussbaum he suffered from "disorganized thinking at least 50% of the time" (Tr. 258). Dr. Nussbaum also noted, however, that plaintiff's thought processes were normal during the examination (Tr. 258). ALJ Katz accurately described the record in his decision, stating that on August 20, 2013, plaintiff had "reported feelings of confusion and paranoid delusions," but that Dr. Nussbaum found no evidence of disorganized thought processes during his clinical observation (Tr. 29).

Third, although plaintiff had reported to SW Scelia on July 16, 2013 that he was concerned about running out of medication and had told Dr. Nussbaum on July 25, 2013 that he had a low supply of medication and was rationing it by taking lower than prescribed doses, the ALJ misconstrued the treatment notes and found as follows:

> In July 2013, the claimant reported that he had stopped taking certain medications; yet, mental status evaluation by his therapist noted that he has relatively calm with an appropriate affect and no evidence of psychosis or distress.

(Tr. 29). ALJ Katz erred in finding that plaintiff had entirely stopped taking his medication in July 2013, without any evidence in the record supporting such a conclusion. However, the ALJ's inaccurate description of this issue is harmless. See Johnson v. Bowen, supra, 817 F.2d 983, 986 (2d Cir. 1987)("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."). ALJ Katz merely misstated the date on which HVMH's medical staff found that plaintiff had been noncompliant with his medication regimen. Although the record reflects that plaintiff did not miss any doses of his psychotropic medication in July 2013, it does indicate that HVMH's Mental Health Treatment Plan, dated December 23, 2014, noted that plaintiff missed several doses of his Xanax after misplacing his medication, and that,

despite feeling more anxious, plaintiff did not present with overt elation or psychosis (Tr. 362). The ALJ's error is so minor it could not have affected the outcome.

Thus, ALJ Katz did not selectively rely on evidence and followed the standards set forth by the Commissioner's regulations.

IV. Conclusion

Accordingly, for all the foregoing reasons, the Commissioner's motion for judgment on the pleadings (D.I. 19) is granted and plaintiff's motion (D.I. 17) is denied. The Clerk is respectfully requested to enter judgment in favor of the Commissioner and to mark Docket Items 17 and 19 closed.

Dated:    New York, New York
          January 19, 2018

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel of Record